1  DONNA M. WITTIG, ESQ.
   Nevada Bar No. 11015
2  E-mail:  dwittig@nevadafirm.com
   COTTON, DRIGGS, WALCH,
3  HOLLEY, WOLOSON & THOMPSON
   400 South Fourth Street, Third Floor
4  Las Vegas, Nevada 89101
   Telephone:    702/791-0308
5  Facsimile:    702/791-1912
6
7  DAVID H. BECKER, ESQ., *Pro Hac Vice*
   Oregon Bar No. 081507
8  E-mail: davebeckerlaw@gmail.com
   Law Office of David H. Becker, LLC
9  833 SE Main Street # 302
   Portland, OR 97214
10 (503) 388-9160
11
   *Attorneys for Plaintiffs*
12
13
14              **UNITED STATES DISTRICT COURT**
15                  **DISTRICT OF NEVADA**
16
17 JUDY BUNDORF, an individual; FRIENDS OF
   SEARCHLIGHT DESERT AND MOUNTAINS;   CASE NO.:    2:13-cv-616-MMD-PAL
18 BASIN AND RANGE WATCH; ELLEN ROSS,
   an individual; and RONALD VAN FLEET, JR.,
19 an individual,
20              Plaintiffs,
21      v.                                          **UNOPPOSED MOTION FOR LEAVE TO
                                                    FILE FIRST SUPPLEMENTAL AND
22 S.M.R. JEWELL, Secretary of the Interior,        AMENDED COMPLAINT**
   BUREAU OF LAND MANAGEMENT, U.S.
23 FISH & WILDLIFE SERVICE,                          **FILED PURSUANT TO LOCAL RULE 6-2**
24              Defendants,
   v.
25
   SEARCHLIGHT WIND ENERGY, LLC
26
                Intervenor.
27
28      Pursuant to Federal Rules of Civil Procedure 15(a)(2) and 15(d) and Local Rule 15-1,

plaintiffs Judy Bundorf, Friends of Searchlight Desert and Mountains, Basin and Range Watch, Ellen Ross, and Ronald Van Fleet, Jr. move for leave to file their First Supplemental and Amended Complaint, a copy of which is attached as an exhibit to this motion. Defendants and Intervenor have provided written consent that they do not oppose this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs move the Court for leave to supplement and amend the Complaint (Dkt # 1) to supplement and amend its claims and allegations, including by alleging transactions, occurrences and events that have happened since the Complaint was filed on April 10, 2013. *See* Exhibit 1 ([Proposed] First Supplemental and Amended Complaint). The original Complaint indirectly referenced the federal defendants' obligation to supplement its environmental analyses under the National Environmental Policy Act ("NEPA"), an issue that plaintiffs raised throughout their comments to the Draft Environmental Impact Statement. The proposed First Supplemental and Amended Complaint clarifies the jurisdictional basis for this claim. It also adds a claim under the Migratory Bird Treaty Act ("MBTA") for defendants' authorization of the Searchlight Wind Energy Project without first obtaining a permit pursuant to that statute, based on a recent legal clarification that unintended killing of migratory birds by industrial-scale wind facilities constitutes unlawful take under that statute.

### ARGUMENT

## I.      STANDARD OF REVIEW

The Court "may permit [a] party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed. R. Civ. P. 15(d). Motions to supplement a pleading are evaluated under the same standard as motions to amend under Rule 15(a). *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996) (standard for supplementing a pleading under Rule 15(d) "is the same" as the standard governing amendments under Rule 15(a)) (citing *Intrepid v. Pollock*, 907 F.2d 1125, 1131 (Fed. Cir. 1990); 6A Charles Alan Wright *et al.*, Federal Practice & Procedure §

1504, pp. 185–86 (2d ed. 1990)). Rule 15 provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

While permission to supplement or amend is committed to the Court's discretion, the Ninth Circuit has long held that Rule 15's policy favoring revised pleadings is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation and citations omitted). Rule 15(d) provides the Court with broad discretion in allowing a supplemental pleading as a tool of judicial economy and convenience, and its use is therefore favored. *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988). Claims that accrue after the date of the initial complaint are properly analyzed under Rule 15(d) as supplementation of a complaint rather than amendment to a complaint, although as a practical matter the analysis generally yields the same result. *United States v. Reiten*, 313 F.2d 673, 674 (9th Cir. 1963). Allowing supplementation and amendment here is consistent with the "general purpose of the Rules to minimize technical obstacles to a determination of the controversy on its merits." *Id.*

Leave to supplement and amend should be granted unless the revised pleading would result in undue prejudice to the opposing party, is the product of bad faith, would cause undue delay in the proceedings, or would be a futile exercise. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citations omitted). In the Ninth Circuit, it is an abuse of discretion to deny leave to amend in the absence of any of the above reasons. *See Keniston v. Roberts*, 717 F.2d 1295 (9th Cir. 1983). The Supreme Court also has held that leave to amend should be "freely given" in the absence of these reasons. *Foman v. Davis*, 371 U.S. 178, 182 (1962) (district court abused its discretion in refusing to permit plaintiff to amend complaint).

Among these factors, "prejudice to the opposing party . . . carries the greatest weight." *Eminence Capital, LLC*, 316 F.3d at 1052. Therefore, "[u]nless undue prejudice to the opposing party will result, a trial judge should ordinarily permit a party to amend its complaint." *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973) (denial of leave to file amended complaint, even five years after filing of initial complaint, was an abuse of discretion in the absence of prejudice); *see also Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1493 (9th Cir. 1987) (mere delay in proffering an amendment to a complaint does not justify denying leave to amend).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.     PLAINTIFFS' PROPOSED FIRST SUPPLEMENTAL AND AMENDED COMPLAINT IS TIMELY AND IS NOT MADE IN BAD FAITH.

Plaintiffs proposes to supplement and amend its Complaint and to clarify certain aspects of its claim that the BLM violated NEPA by failing to produce a supplemental Draft Environmental Impact Statement or a supplemental Final Environmental Impact Statement, add additional factual developments since the Complaint was filed on April 10, 2013, and include a claim under the MBTA. The proposed First Supplemental and Amended Complaint clarifies that part of the NEPA Claim (Claim One) in this case is a claim that federal defendants failed to properly supplement their NEPA evaluations, a claim that arises under Administrative Procedure Act § 706(1). 5 U.S.C. § 706(1). It also describes that additional concerns have arisen regarding energy project impacts to desert tortoises, eagles, and other birds, also warranting supplemental NEPA analysis. Ex. 1 ¶¶ 6, 67, 72, 73. Notable among these was the November 4, 2013 agreement by Duke Energy Renewables, Inc. to plead guilty to two counts of violation of the MBTA at industrial-scale wind generating facilities in Wyoming for the killing of 163 migratory birds, including 14 golden eagles, without valid permits. *Id*. ¶ 72.

The definition of "take" in the MBTA is essentially the same as that under the Bald and Golden Eagle Protection Act ("BGEPA") which is the subject of Claim Four, and the proof of the claim—migratory bird or eagle deaths will result from the project, and no permit was obtained before approval of the project—will be the same for both statutes. Accordingly the claim of violation of the MBTA is incorporated into Claim Four along with the BGEPA claim.

NFS does not seek to revise its Complaint in bad faith, nor are the revisions sought in order to destroy diversity jurisdiction, to unreasonably delay judicial proceedings, or for any other impermissible purpose, but rather to accurately reflect factual developments since the date of the First Supplemental and Amended Complaint and to clarify the claims in this case going forward. *See Sorosky v. Burroughs Corp*., 826 F.2d 794, 805 (9th Cir. 1987) (upholding district court's denial of leave to amend for bad faith where amendment was sought in an admitted attempt to destroy court's diversity jurisdiction); *see also Hip Hop Beverage Corp. v. RIC Representacoes Importacao e Comercio Ltda.*, 220 F.R.D. 614, 622 (C.D. Cal. 2003) (citing

1   evidence of bad faith).

2   **III.   PLAINTIFFS' PROPOSED FIRST SUPPLEMENTAL AND AMENDED COMPLAINT WILL NOT UNDULY PREJUDICE DEFENDANTS.**

3

4        "The party opposing amendment bears the burden of showing prejudice." *DCD*

5   *Programs*, 833 F.2d at 187. In this case, defendants and intervenor have consented to the filing

6   of this amended complaint, and there will be no prejudice to them by its filing. There currently

7   are no signed rights-of-way for the challenged industrial wind project, and it does not appear that

8   the project is likely to proceed in the near future, making the likelihood of prejudice remote. *See*

9   http://www.blm.gov/nv/st/en/fo/lvfo/blm_programs/energy/searchlight_wind_energy.html

10  (Searchlight Wind Energy Project official website, showing the two rights-of-way—Appendix A

11  and Appendix B under "Record of Decision"—as "pending," more than eight months after the

    Record of Decision was signed) (last visited December 24, 2013).

12  **IV.   PLAINTIFFS' PROPOSED FIRST SUPPLEMENTAL AND AMENDED COMPLAINT IS NOT FUTILE.**

13

14       The test for "futility" with respect to a motion to supplement or amend under Rule 15 is

15  the same as the test for a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon

16  which relief may be granted. *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)

17  ("[A] proposed amendment is futile only if no set of facts can be proved under the amendment to

18  the pleadings that would constitute a valid and sufficient claim or defense."); *Wetterman v.*

19  *Monaco Coach Corp.*, 141 F. Supp. 2d 1263, 1264 (D. Or. 2003) (same). The supplemental

20  claims here are justiciable and facts could be proved that would constitute valid claims under

21  NEPA and the MBTA. Accordingly, the proposed Supplemental and Amended Complaint

22  presents more than "colorable" claims for relief—claims that cannot be described as futile. As

23  the Ninth Circuit has held, "[w]here the underlying facts or circumstances of a case 'may be a

24  proper subject of relief, [a plaintiff] ought to be afforded an opportunity to test his claim on the

25  merits.'" *DCD Programs*, 833 F.2d at 188 (quoting *Foman*, 371 U.S. at 182).

                                       **CONCLUSION**

26

27       For the reasons stated above, Plaintiffs respectfully asks the Court to grant its Motion for

28

1   Leave to File its First Supplemental and Amended Complaint.

2
3          Respectfully submitted this 24th day of December 2013.

4                                  _____/s Donna M. Wittig_____
                                   DONNA M. WITTIG, ESQ.
5                                  Nevada Bar No. 11015
                                   E-mail: dwittig@nevadafirm.com
6                                  COTTON, DRIGGS, WALCH,
                                   HOLLEY, WOLOSON & THOMPSON
7                                  400 South Fourth Street, Third Floor
                                   Las Vegas, Nevada 89101
8                                  (702) 791-0308

9                                  _____/s David H. Becker_____
                                   DAVID H. BECKER, ESQ., *Pro Hac Vice*
10                                 Oregon Bar No. 081507
                                   E-mail: davebeckerlaw@gmail.com
11                                 Law Office of David H. Becker, LLC
                                   833 SE Main Street # 302
12                                 Portland, OR 97214
                                   (503) 388-9160
13

14                                 Of Attorneys for Plaintiffs

15
                                   **Exhibits**
16

17  Exhibit 1: Proposed First Supplemental and Amended and Supplemental Complaint for
    Declaratory Relief and Injunctive Relief
18

19          Leave to file Plaintiffs' First Supplemental and Amended Complaint is GRANTED.

20  Plaintiffs shall file their First Supplemental and Amended Complaint within 5 days after this

21  Order is filed.

22

23

24                                 **IT IS SO ORDERED:**

25                                 _____

26
                                   United States District Judge
27
                                   **DATED:** ____January 10, 2014____
28

1

**CERTIFICATE OF SERVICE**

2

Pursuant to Fed. R. Civ. P. 5(b); LR 5-1

3

4

I certify that on the date indicated below, I filed the foregoing document(s) with the Clerk of the Court using the CM/ECF system, which would provide notification and a copy of same to counsel of record.

5

6

Dated: December 24, 2013

7                                                      _____/s David H. Becker_____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNOPPOSED MOTION FOR LEAVE TO FILE FIRST SUPPLEMENTAL AND AMENDED COMPLAINT

DONNA M. WITTIG, ESQ.
Nevada Bar No. 11015
E-mail:  dwittig@nevadafirm.com
COTTON, DRIGGS, WALCH,
HOLLEY, WOLOSON & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/791-0308
Facsimile:    702/791-1912

DAVID H. BECKER, ESQ., *Pro Hac Vice*
Oregon Bar No. No. 081507
E-mail: davebeckerlaw@gmail.com
Law Office of David H. Becker, LLC
917 SW Oak St, Suite 409
Portland, OR 97205
(503) 388-9160

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JUDY BUNDORF, an individual; FRIENDS OF SEARCHLIGHT DESERT AND MOUNTAINS; BASIN AND RANGE WATCH; ELLEN ROSS, an individual; and RONALD VAN FLEET, SR., an individual,<br><br>                 Plaintiffs,<br><br>         v.<br><br>S.M.R. JEWELL, Secretary of the Interior, BUREAU OF LAND MANAGEMENT, U.S. FISH & WILDLIFE SERVICE,<br><br>                 Defendants,<br><br>        and<br><br>SEARCHLIGHT WIND ENERGY, LLC,<br><br>                 Defendant-Intervenor | CASE NO.:    2:13-cv-616-MMD-PAL<br><br>**[PROPOSED]**<br>**FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**[Environmental Matter]** |

- 1 –

## INTRODUCTION

1.      Plaintiffs Judy Bundorf, Friends of Searchlight Desert and Mountains, Basin and Range Watch, Ellen Ross, and Ronald Van Fleet, Jr., challenge the decision by Interior Secretary Ken Salazar to approve a controversial industrial-scale wind energy facility and transmission line in the Searchlight desert and mountains of Southern Nevada.

2.      On March 13, 2013, Secretary Salazar signed a Record of Decision ("ROD") approving the grant of rights-of-way over public lands administered by Defendant Bureau of Land Management ("BLM") for the Searchlight Wind Energy Project (the "Project"). The ROD approved selection of the "Preferred Alternative" from a December 2012 Final Environmental Impact Statement ("FEIS"), which was prepared by consultants for the project proponent and which presents a one-sided and incomplete portrait of the proposed project and its likely adverse environmental impacts.

3.      As described in the FEIS and approved in the ROD, the Project would involve rights-of-way for the construction, operation and maintenance of an 87-turbine generator site on approximately 18,949 acres of public lands managed by BLM on ridgelines and plateau areas east of the town of Searchlight, intended to produce up to 200 megawatts ("MW") of electricity. The Project would include 6.1 miles of overhead transmission lines connecting two substations on the generator site and 2.6 miles of overhead transmission lines crossing the Piute-Eldorado Valley Area of Critical Environmental Concern ("ACEC") to connect the generator site to a new switching station adjacent to the existing Davis-Mead 230 kilovolt ("kV") transmission line east of the generator site.

4.      The Project generator site and associated transmission lines will dominate the Searchlight desert and mountains, looming over public and private lands near the town of Searchlight, encroaching on the only access to Cottonwood Cove Marina within the Lake Mead National Recreation Area. Wind turbines, with spinning blades that reach as high as the top of Caesar's Palace in Las Vegas and flashing lights that would mar an area of dark night skies, would impair scenic vistas and the experience of recreational visitors, and degrade human health and the economic livelihood of residents and businesses in the Searchlight area.

Exhibit 1, Page 2 of 32
No. 13-616 - Motion to Supplement & Amend Complaint

5.     The Project would pose significant adverse harm to a wide array of sensitive and protected species—including desert tortoise, bighorn sheep, golden eagles, bald eagles, and residential and migratory birds and bats—through direct, indirect, and cumulative impacts. Together, the generator site, transmission lines, and switching station would occupy a footprint of approximately 8,400 acres of public lands within the 18,949 acre Project area and affect additional public lands surrounding the Project area, including the ACEC and the Lake Mead National Recreation Area. The Project would involve widening of over eight miles of roads and construction of over 27 miles of new roads, 8.7 miles of new overhead transmission lines, and nearly eight miles of collection lines, including 2.7 miles underground. Construction and operation of the Project will fragment thousands of acres of desert tortoise habitat, killing and disturbing tortoises and adversely modifying designated critical habitat. The Project will disturb migratory and habitat corridors for bighorn sheep and cause cumulative mortalities of bald and golden eagles, other raptors, birds and bats. Federal Defendants have not addressed these impacts fully in their inadequate FEIS, ROD, and Biological Opinion ("BiOp") regarding effects on desert tortoise.

6.     Secretary Salazar approved the ROD based on the FEIS's inadequate and incomplete analysis of the likely impacts of the Project on desert tortoises, golden eagles, bald eagles, bighorn sheep, and many other sensitive species of birds, bats, and wildlife that live in or migrate through the Searchlight area. Even though the FEIS acknowledged that other wind facilities result in admitted mortality to raptors, other birds, and bats, the FEIS failed to address the likely direct, indirect, and cumulative impacts of the transmission line and wind facility on these species and their habitats, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–61. Approval of the Project also will allow the unpermitted taking of golden eagles and bald eagles in violation of the Bald & Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. §§ 668–668d, similar to the recent killing of a golden eagle at the Spring Valley Wind facility near Ely, Nevada, and also will allow the unpermitted taking of migratory birds (including eagles) in violation of Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 701–712, similar to the unpermitted take to which Duke Energy Renewables, Inc. pled guilty in

November 2013 for the take of migratory birds at wind facilities in Wyoming. By not complying with the applicable legal duties and requirements, Secretary Salazar acted in a manner that is arbitrary, capricious, an abuse of discretion, and contrary to law under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., requiring reversal and remand by this Court.

7.      In addition, instead of adhering to statutory duties imposed upon him under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1787, Secretary Salazar selectively relied upon his own agency's internal policies seeking to promote renewable energy on public lands, while disregarding other policies calling for protection of sensitive and ESA-listed species, including golden eagles, bighorn sheep, several species of bats, and desert tortoises, as well as provisions of the Las Vegas Resource Management Plan ("RMP"), again requiring reversal and remand.

8.      One species of particular concern is the Mojave desert tortoise (*Gopherus agassizii*). The U.S. Fish and Wildlife Service ("USFWS") has designated the desert tortoise as "threatened" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–43. Desert tortoises are found throughout the Project area, with USFWS estimating that over 388 acres of tortoise habitat will be directly disturbed by construction of the Project. Thousands of acres more of habitat, including designated critical habitat in the ACEC, will be adversely modified by the impacts from noise from the construction and operation of the Project, fragmenting habitat connectivity, disrupting their ability to communicate, and displacing desert tortoises from their habitat. The BiOp fails to consider the impacts of noise from the Project's construction and operation on tortoises and designated critical habitat and fails to take into account the direct, indirect and cumulative impacts of the Project and other energy development on the survival and recovery of the tortoise.

9.      By relying on a BiOp that fails to consider important factors regarding the Project's impacts to desert tortoise and approving the Project that will contribute to desert tortoise population losses and habitat degradation, the Secretary's approval of the ROD is again arbitrary, capricious, an abuse of discretion, and contrary to law, requiring reversal and remand pursuant to the APA, 5 U.S.C. § 706.

- 4 –

10.     Construction of the Project may commence in 2014, threatening immediate and irreparable harm to numerous sensitive wildlife species and habitats, including desert tortoises, golden eagles and bald eagles, absent injunctive relief from this Court pending adjudication of the merits of Plaintiffs' claims.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the NEPA, 42 U.S.C. §§ 4321–35, ESA, 16 U.S.C. §§ 1531–43, FLPMA, 43 U.S.C. §§ 1701–1787, BGEPA, 16 U.S.C. §§ 668–668d, MBTA, 16 U.S.C. §§ 701–712, the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701–06.

12.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiffs reside in this district, a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the public lands in question are located in this district.

13.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

14.     Plaintiff JUDY BUNDORF owns approximately 90 acres of property located approximately 1.4 miles north of the Project site. She is an active member of several community groups, including Friends of Searchlight Desert and Mountains and Basin and Range Watch, which are concerned about the Project's effects on the public lands and resources of the Searchlight area. Judy Bundorf advocates for the preservation of the public lands and resources of the Searchlight area in their undeveloped state. She uses the BLM lands that will be affected by the project for recreational, aesthetic, and spiritual activities. The Project will adversely affect Judy Bundorf's interests by introducing an industrial-scale wind energy generation and transmission project into the Searchlight mountains and surrounding area, thereby harming her use and enjoyment of her land and the public natural resources of the area. She has spoken at

- 5 -

public meetings related to the Project, authored multiple letters opposing the Project on behalf of community groups and herself and submitted them to BLM. Judy Bundorf submitted comments to BLM throughout the Project's approval process.

15. Plaintiff FRIENDS OF SEARCHLIGHT DESERT AND MOUNTAINS ("Friends") is a community organization comprising numerous individuals and families residing in the Searchlight area or who use the public lands in the Project area. Members of Friends are directly affected by BLM's land use planning and management of the Project area because that is where they live and recreate. Friends and its members are interested in preservation of lands within the Project area and surrounding area in their undeveloped state to maintain and enhance their ecological integrity, scenic beauty, wildlife, recreational amenities, cultural resources, spiritual values, and contribution to the local economy. The Project will adversely affect Friends' interests by introducing an industrial-scale wind energy generation and transmission project into the Searchlight mountains and surrounding area, thereby harming its members' use and enjoyment of the public natural resources of the area. Members of Friends submitted comments throughout the Project's approval process.

16. Plaintiff BASIN AND RANGE WATCH is a community organization comprising numerous volunteers, naturalists, artists and writers who live in or enjoy the deserts of Nevada and California, who work to stop the destruction of the Mojave and Great Basin Deserts and who use the public lands in the Project area and encourage the responsible development of renewable energy. Members of Basin and Range Watch are directly affected by BLM's land use planning and management of the Project area because that is where they live and recreate. Basin and Range Watch and its members are interested in preservation of lands within the Project area and surrounding area in their undeveloped state to maintain and enhance their ecological integrity, scenic beauty, wildlife, recreational amenities, cultural resources, spiritual values, and contribution to the local economy. The Project will adversely affect Basin and Range Watch's interests by introducing an industrial-scale wind energy generation and transmission project into the Searchlight mountains and surrounding area, thereby harming its members' use and enjoyment of the public natural resources of the area. Basin and Range Watch submitted

Exhibit 1 - Page 6 of 32
No. 13-616 - Motion to Supplement & Amend Complaint

comments throughout the Project's approval process.

17.     Plaintiff ELLEN ROSS owns approximately 17 acres of property located less than 800 feet from the Project site. She has been a real estate agent for 30 years and has sold land and homes in the Searchlight area. She is also a certified Nevada naturalist and part-time river guide. She is an active member of community groups, including Friends of Searchlight Desert and Mountains, which is concerned about the Project's effects on the public lands and resources of the Searchlight area. Ellen Ross advocates for the preservation of the public lands and resources of the Searchlight area in their undeveloped state. She uses the BLM lands that will be affected by the project for recreational, aesthetic, and spiritual activities. The Project will adversely affect Ellen Ross's interests by introducing an industrial-scale wind energy generation and transmission project into the Searchlight mountains and surrounding area, thereby harming her use and enjoyment of her land and the public natural resources of the area. She has spoken at public meetings related to the Project, authored multiple letters opposing the Project and submitted them to BLM. Ellen Ross submitted comments to BLM throughout the Project's approval process.

18.     Plaintiff RONALD VAN FLEET, SR., is a member of the Fort Mojave tribe.  His family used to live at Cottonwood Island (where Cottonwood Cove is now) and were displaced when Davis Dam and Lake Mohave were built.  He and his tribe use spirit trails that run through the Project site and into Spirit Mountain. Ronald Van Fleet advocates for the preservation of the public lands and resources of the Searchlight area in their undeveloped state.  He uses the BLM lands that will be affected by the project for spiritual activities, including spiritual runs. The Project will adversely affect Ronald Van Fleet's interests by introducing an industrial-scale wind energy generation and transmission project into the Searchlight mountains and surrounding area, thereby harming his use and enjoyment of the land and the public natural resources of the area. He has spoken at public meeting related to the Project.

19.     Defendant S.M.R. JEWELL is Secretary of the U.S. Department of Interior, and has statutory authority and responsibility to comply with all federal laws in the management of the federal public lands at issue here, including NEPA, ESA, FLPMA, and the BGEPA.

- 7 –

1   Contrary to the normal practice, wherein BLM officials make decisions on whether to issue

2   grants of rights-of-way on the public lands under FLPMA, Secretary Jewell's predecessor, Ken

3   Salazar, personally signed the March 2013 ROD approving the Project. She is sued solely in her

4   official capacity. She was automatically substituted as defendant for Secretary Salazar pursuant

5   to Federal Rule of Civil Procedure 25(d) upon taking office on April 12, 2013.

6           20.      Defendant BUREAU OF LAND MANAGEMENT ("BLM") is an agency or

7   instrumentality of the United States, within the Department of Interior, and is charged with

8   managing the public lands and resources of the Project area and surrounding area in accordance

9   and compliance with federal laws and regulations. BLM was the lead agency that officially

10  released the Searchlight Wind Project FEIS.

11          21.      Defendant U.S. FISH & WILDLIFE SERVICE ("USFWS") is an agency or

12  instrumentality of the United States, within the Department of Interior, and is charged with the

13  management and protection of species listed under the ESA, as well as with maintaining healthy

14  populations of golden eagles and bald eagles pursuant to the BGEPA. The USFWS prepared a

15  BiOp addressing effects of the Project on desert tortoise and also reviewed the Project's effects

16  on golden eagles.

17          22.      Intervenor SEARCHLIGHT WIND ENERGY, LLC is the applicant for one of the

18  two rights-of-way to be granted under the Project and the primary developer of the Project.

19  Searchlight Wind Energy, LLC is a wholly-owned by Catamount Energy, which in turn is

20  wholly-owned by DEGS Wind I, LLC, which in turn is owned by Duke Energy Generating

21  Services Holding Company, Inc. Searchlight Wind Energy, LLC was granted intervenor status

22  by the Court on November 25, 2013.

23                              **LEGAL BACKGROUND**

24  **A.      The National Environmental Policy Act**

25          23.      NEPA, 42 U.S.C. § 4321 *et seq.*, is our "basic national charter for protection of

26  the environment." 40 C.F.R. § 1500.1(a). It serves two purposes: (1) "it ensures that the agency,

27  in reaching its decision, will have available, and will carefully consider, detailed information

28  concerning significant environmental impacts," and (2) it "guarantees that the relevant

- 8 –

information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

24.     NEPA requires agencies to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. Agencies must consider every significant aspect of the environmental impact of a proposed action. This includes studying the direct, indirect, and cumulative impacts of the action. *See* 40 C.F.R. §§ 1508.7, 1508.8.

25.     Cumulative impacts are impacts that "result [] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 40 C.F.R. § 1508.7. Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

26.     In analyzing the cumulative effects of a proposed action, an agency must do more than just catalogue "relevant past projects in the area": it must also include a "useful analysis of the cumulative impacts of past, present and future projects." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997). Agencies must provide "some quantified or detailed information" about cumulative impacts—"[g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004). When an EIS does not "sufficiently identify or discuss the incremental impacts" expected from successive projects, or "how those individual impacts might combine or synergistically interact with each other to affect the [] environment," it does not satisfy NEPA. *Id.*

27.     In addition, an agency must disclose and discuss any "responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. §1502.9(b). "This disclosure requirement obligates the

agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for Biol. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003). An agency must prepare a supplement to either a draft or final environmental impact statement if the agency makes substantial changes to the proposed action or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1)(i)–(ii).

28.   Analysis prepared in order to satisfy NEPA must include consideration of a reasonable range of alternatives to a proposed action. 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14 (alternatives including the proposed action).

29.   Secretary Salazar breached his statutory duties and abused his discretion under NEPA by relying upon a one-sided and inadequate FEIS to approve the ROD for the Project in multiple respects, as alleged herein.

**B.   ESA Requirements**

30.   Congress enacted the Endangered Species Act to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "Conserve" means to use all methods and procedures necessary to bring threatened and endangered species to a point where the protections afforded by the statute are no longer necessary. 16 U.S.C. § 1532(3).

31.   The ESA requires the Secretary to list species either as threatened or endangered based on the present or threatened destruction, modification or curtailment of a species' habitat or range, as well as other factors. 16 U.S.C. § 1533(a)(1). An endangered species is one "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is one that is "likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20).

32.   Concurrently with listing a species, Section 4 of the ESA requires the Secretary to designate the species' "critical habitat" and prepare a recovery plan. 16 U.S.C. §§ 1533(a)(3) and

- 10 -

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
No. 13-616 - Motion to Supplement & Amend Complaint

Exhibit 1 - Page 10 of 32

(f). Critical habitat is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations. 16 U.S.C. § 1532(5)(A). Critical habitat is the habitat essential for the recovery of the species.

33.     Section 9 of the ESA makes it unlawful for any person to "take" a threatened or endangered species. 16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31; 50 C.F.R. § 223.203(a). "Take" is defined broadly under the ESA and its regulations to include harassing, harming, wounding, killing, trapping, capturing or collecting a listed species either directly or by degrading its habitat sufficiently to impair essential behavior patterns. 16 U.S.C. § 1532(19). Section 9 prohibits a state or federal agency or official from causing take by authorizing an action which results in take.

34.     Under Section 7 of the ESA, all federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

35.     If a proposed action "may affect" a listed species within the management ambit of USFWS or its critical habitat, the action agency must consult with USFWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). For actions which are likely to adversely affect a listed species, the action agency must seek "formal" consultation, 50 C.F.R. § 402.14(a), while for actions not likely to affect a listed species the agency may seek "informal" consultation, 50 C.F.R. § 402.14(b).

36.     USFWS is responsible for consultations regarding terrestrial species such as desert tortoise. See 50 C.F.R. § 402.01(b).

37.     During consultation, USFWS must review all relevant information, evaluate the current status of the species or its critical habitat, and evaluate the effects and cumulative effects of the proposed action on the listed species and its critical habitat. 50 C.F.R. § 402.14(g)(1)–(3). Throughout its analysis, the consulting agency must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d).

- 11 –

38.     At the completion of formal consultation, USFWS issues a biological opinion, such as the BiOp in this case. The BiOp determines whether the agency action is likely to jeopardize the species or adversely modify the species' critical habitat. Regulations implementing Section 7 of the ESA define "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. If the action's impact on a species' habitat threatens either the recovery or survival of the species, the BiOp must conclude that the action adversely modifies critical habitat.  If a BiOp concludes that an action jeopardizes the continued existence of the species or adversely modifies its critical habitat, the BiOp may identify Reasonable and Prudent Alternatives ("RPAs") that, if followed in the Incidental Take Statement ("ITS"), would allow the action to proceed in compliance with the ESA.

39.     If USFWS determines that jeopardy is not likely, or that reasonable and prudent alternatives to the proposed action will avoid jeopardy, and that any taking of listed species incidental to the proposed action will not violate section 7(a)(2) of the ESA, USFWS must include an ITS, such as the ITS in this case, with the BiOp. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7). Only if the terms and conditions of the ITS are followed is the action agency exempted from Section 9's take prohibition. 16 U.S.C. § 1536(o)(2); 50 C.F.R.§ 402(i)(5). The authorized take must be incidental to, and not the purpose of, carrying out an otherwise lawful activity.

40.     The ITS (1) specifies the amount or extent of the impact on the species of any incidental taking, (2) specifies Reasonable and Prudent Measures to minimize such impact, and (3) sets forth the Terms and Conditions that must be complied with to implement the Reasonable and Prudent Measures. 50 C.F.R. § 402.14(i)(1)(i), (ii), (iv).

41.     If during the course of the action the amount or extent of incidental taking specified in the ITS is exceeded, or new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, the action

- 12 -

agency must immediately reinitiate formal consultation. 50 C.F.R. §§ 402.14(i)(4), 402.16(a)-(b)

42.     During consultation, the action agency may not make any irreversible or irretrievable commitments of resources that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures. 16 U.S.C. § 1536(d).

43.     Section 7(a)(2) of the ESA includes, in addition to the consultation obligations, a substantive and on-going duty requiring federal agencies to insure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.

### C.     FLPMA Requirements

44.     Enacted in 1976, FLPMA establishes basic legal mandates governing the administration and management of public lands at issue here, including issuance of rights-of-way over the public lands. 43 U.S.C. § 1701 *et seq.*

45.     FLPMA and its implementing regulations provide that the Secretary of Interior must develop and regularly update land use plans (called Resource Management Plans, or RMPs) for the public lands under his control, and that all management activities shall be consistent with such plans. 43 U.S.C. § 1712; 43 C.F.R. § 1610.5-3(a).

46.     FLPMA also requires that the public lands "shall" be managed "for multiple use and sustained yield." 43 U.S.C. § 1732(a). FLPMA defines "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources consistent with multiple use." 43 U.S.C. § 1702(b). FLPMA further mandates that the Secretary of Interior "shall" take any action necessary to prevent "unnecessary or undue degradation" of public lands.  43 U.S.C. § 1732(b).

47.     Section 505 of FLPMA mandates that Defendant Salazar is obligated to ensure that any grant of right-of-way for the Project "will carry out the purposes" of FLPMA and "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." *Id*. § 1765(a). Secretary Salazar breached that statutory duty and abused his discretion in approving the Project's ROD.

48.     Section 505 also requires that the Secretary must select and impose those terms

- 13 -

Exhibit 1   Page 13 of 32

and conditions deemed necessary to, among other things, "protect Federal property and economic interests," efficiently manage the lands subject to the right-of-way "or are adjacent thereto," locate the right-of-way "along a route that will cause least damage to the environment," and "otherwise protect the public interest" in the right-of-way lands or lands "adjacent thereto." *Id.* § 1765(b). Secretary Salazar has also breached that statutory duty and abused his discretion in approving the Project's ROD.

49.     The Las Vegas RMP designates all ACECs, exclusive of designated corridors and with certain exceptions, as "right of way avoidance areas." The ROD would authorize rights of way for linear transmission facilities and construction of a switching station within the right-of-way avoidance area in desert tortoise habitat in the Piute-Eldorado Valley ACEC.

**D.     BGEPA Requirements**

50.     Originally enacted in 1940 and amended several times since, the BGEPA provides for the protection of the bald eagle (the national emblem) and the golden eagle by prohibiting, except under certain specified conditions, the taking, possession and commerce of such birds. 16 U.S.C. §§ 668–668d.

51.     The BGEPA contains criminal and civil prohibitions against the taking of golden eagles and bald eagles. Subdivision (b) makes it a civil offense to "take . . . in any manner . . . any bald eagle . . . or any golden eagle" unless permitted to do so. 16 U.S.C. §668(b). Under the BGEPA, "'take' includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb." 16 U.S.C. § 668c; 50 C.F.R. § 22.3 ("*Take* means pursue, shoot, shoot at, poison, wound, kill, capture, collect, or molest or disturb"). The USFWS may issue permits authorizing the incidental take of bald or golden eagles. 50 C.F.R. § 22.26. By authorizing the Project, which is almost certain to cause take of bald eagles and golden eagles, without first obtaining a permit authorizing take of bald or golden eagles, Secretary Salazar has breached his statutory duty to protect these species and abused his discretion in approving the Project's ROD.

**E.     MBTA Requirements**

52.     Originally enacted in 1918 to implement the 1916 Convention between the U.S. and Great Britain (for Canada), the MBTA provides for the protection of migratory birds by

- 14 -

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
No. 13-616 - Motion to Supplement & Amend Complaint

Exhibit 1 - Page 14 of 32

prohibiting the take or killing of migratory birds unless permitted by regulation.

53.     The MBTA makes it illegal to "pursue, hunt, take, capture, kill, attempt to take, capture, or kill ..." any migratory bird or "any part, nest, or egg of any such bird ..., by any means or in any manner", 16 U.S.C. § 703, except as permitted by valid permit issued pursuant to regulations. 50 C.F.R. § 21.11. The FEIS acknowledges that the Project will kill migratory birds, as those are defined and listed in 50 C.F.R. §§ 10.12 and 10.13. By authorizing a Project that will take migratory birds without obtaining a permit authorizing such take, Secretary Salazar has breached his statutory duty to protect these species and abused his discretion in approving the Project's ROD.

## THE SEARCHLIGHT MOUNTAINS AND SURROUNDING AREA

54.     The Searchlight desert and mountains in which the Project would be built is a largely unspoiled area ranging up to 3,450 feet in elevation, covered by old-growth Joshua trees, Mojave yuccas, cholla, and creosote bushes, crossed by a few primitive, little-used dirt roads. The Project area and the surrounding ACEC provide important, mostly unfragmented habitat for desert tortoises, bighorn sheep, native lizards, and many species of birds.

55.     The Project area is a migration route for desert bighorn sheep (*Ovis canadensis nelsoni*) linking the Newberry Mountains and Eldorado Mountains, and contains over 500 acres of bighorn sheep winter range. Construction of the Project would block these important linkage routes and likely deprive bighorn sheep of access to several springs on and near the Project site.

56.      Gila monsters and Chuckwalla, classified as sensitive species by the state and federal governments respectively, are present in the Project area. Sixteen of the 23 species of bats found in Nevada use the Project area, including fifteen which are classified as sensitive or protected species by the federal or state government.

57.     Over 60 species of resident and migratory birds use the Project area, including special status species such as golden eagles, bald eagles, Burrowing owls, Loggerhead shrikes, Brewer's sparrow, raptors such as red-tailed hawks, Cooper's hawks, and turkey vultures, and a wide array of songbirds such as yellow warblers, violet green swallows and western tanagers. The Project is located within the Pacific Flyway, an important bird migration corridor.

- 15 -

58.     The Searchlight area contains remarkable scenic values. The Project area is visible from the Lake Mead National Recreation Area to the east, and turbines constructed along Cottonwood Cove Road would dominate the landscape for recreationists and tourists moving between Route 95 and Cottonwood Cove Marina on Lake Mohave or seeking to access backcountry areas in the National Recreation Area. Six designated Wilderness Areas lie close to the Project site, with the Nellis Wash Wilderness lying only two miles from the easternmost border of the site. Dark skies and quiet recreation opportunities abound in the area east of Searchlight where the Project would be located. The Project site and surrounding desert and mountains also have spiritual significance for several Tribes whose ancestral lands would be occupied by this industrial-scale wind energy project.

## THE THREATENED DESERT TORTOISE

59.     The Project area and the surrounding desert, hills and mountains, including the ACEC which surrounds the Project site on three sides, is habitat for the desert tortoise. The desert tortoise was listed by the USFWS as a threatened species under the ESA on April 2, 1990. In addition, as Nevada's state reptile, the desert tortoise is considered a state protected and state threatened species. The USFWS published a recovery plan in June 1994 together with a supplement identifying proposed Desert Wildlife Management Areas, and also designated critical habitat in 1994 in all four states (Arizona, Nevada, Utah and California) supporting the species. The area surrounding the Project site, within the ACEC, is designated critical habitat for tortoises.

60.     Desert tortoises are native to the Mojave and Sonoran Deserts of the Southwestern United States and northwestern Mexico. Tortoises can live up to 30 to 50 years, and spend most of their lives in underground burrows sheltered from extremes of heat and cold, often moving between up to 20 or 25 different burrows per year. Tortoises rely on burrows for shelter, reduction of water loss, and regulation of body temperature. Tortoises show very strong site fidelity, and have well established home ranges where they know where their food, water and mineral resources are, and who their neighbors are. Despite their reliance on burrows, tortoises sometimes move up to 200 meters per day as they engage in foraging or mate-seeking or disperse

- 16 -

to new areas or peripheral areas of their home ranges.

61.     The vast majority of threats to the desert tortoise and its habitat are human land uses. The destruction, fragmentation, and degradation of desert tortoise habitat over past decades —including through the effects of energy development—have caused substantial declines in desert tortoise populations and range reduction.  Although historical numbers and distribution patterns are somewhat speculative, tortoise range and population density has decreased in many areas of its habitat, with appreciable declines at the local level in many areas.

62.     Tortoise population densities vary from 4.1 to 7.2 tortoises per square kilometer in the Eastern Mojave recovery unit within which the Project would be sited. Pre-construction surveys for desert tortoises on the Project site involved narrow paths along the lines of the turbine arrays and access roads, rather than a full-site survey, but even this unreasonably limited survey disclosed a density of 8.2 tortoises per square kilometer in the area surveyed. This density was higher than the average density of any survey in the last decade in all but two of the other five tortoise recovery units.

63.     USFWS cites threats of habitat fragmentation and loss, as well as the inadequacy of existing regulatory mechanisms—particularly on BLM-administered lands, which account for most of the tortoise's remaining habitat—as sources of concern for the species' survival and recovery. USFWS also acknowledges that energy development also poses a significant threat to desert tortoises through habitat loss and fragmentation, largely due to the explosion of solar and wind energy projects impacting tortoise habitat. Nearly 36 miles of roads will be newly-built or upgraded throughout the project site, along with towers to carry overhead transmission lines and underground collector lines that will require excavation or blasting. USFWS expects that tortoises will shift away from project features at the Project site, including roads and turbines, which could impair population connectivity and alter gene flows and affect local genetic structure.

64.     Tortoises are under extraordinary pressure from energy development in California and Nevada. As of November 2010, six solar projects in California and one in Nevada were approved on public lands within the range of the desert tortoise, constituting 3,037.5 megawatts

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Exhibit 1   Page 17 of 32

No. 13-616 - Motion to Supplement & Amend Complaint

(MW) on 9,683 hectares (23,926 acres) and 430 MW on 3,173 hectares (7,840 acres), respectively. Three additional solar projects on private lands in California have been approved totaling 1,063 MW on 1,686 hectares (4,165 acres). Seven solar projects on public lands were still pending, totaling 1,450 MW on 4,314 hectares (10,659 acres) in California and 900 MW on 6,955 hectares (17,186 acres) in Nevada. Three wind projects within the range of the desert tortoise were also pending, totaling 536.5 MW on 11,775 hectares (29,096 acres) of public and private rights-of-way; one of the California projects is proposed within designated critical habitat. Several of these have since been approved. The FEIS and ROD do not evaluate the cumulative impact of the Project in connection with the impacts from other energy development and other sources of tortoise habitat fragmentation and degradation.

65.     In addition to the direct killing and displacement of tortoises likely from the construction of the Project, noise from construction and operation of the Project has a significant potential to adversely impact desert tortoises. The 1994 Recovery Plan cites noise and vibration as having potentially significant effects on the desert tortoise's behavior, communication, and hearing apparatus. Loud noises, such as those associated with the blasting the Project's construction would require, can damage the hearing apparatus of tortoises. The 1994 Recovery Plan states that anthropogenic noise has several potential impacts on desert tortoises, including disruption of communication and damage to the auditory system. Tortoises have relatively sensitive hearing, hierarchical social interactions, and communicate vocally using eleven different classes of vocalizations in a variety of social encounters. Background noise has been shown to mask vocal signals essential for individual survival and reproductive success.

66.     Tortoise vocalizations are low in amplitude (from 0.2 kHz to 4.5 kHz)—in the same range as birds, and in the same low frequency range that is produced by wind turbine operation. These low frequency-range sounds travel longer distances than higher frequency sounds, and therefore are likely to adversely affect tortoises at a greater distance from the turbines. The dominant frequencies that remain after propagation correspond closely to the frequency band width characteristic of desert tortoise vocalizations. The masking effect of these sounds may significantly alter an individual's ability to effectively communicate or respond in

- 18 -

appropriate ways. The same holds true for incidental sounds made by approaching predators; masking of these sounds may reduce a desert tortoise's ability to avoid capture by a predator. The noise from turbine operation throughout the Project site will reach up to 58 dB, with areas of up to 45 dB and 35 dB extending over a mile into tortoise critical habitat in the ACEC to the north, east, and south of the Project site. Neither the FEIS nor the BiOp evaluates the effect of chronic noise from the Project's operation on tortoises on the site, or the adverse modification caused to the surrounding critical habitat in the ACEC. For these reasons, wind projects on or adjacent to desert tortoise habitat reduce and impair such habitat far beyond the collective footprint of the facilities and structures.

67.     Recent environmental analyses and biological opinions regarding industrial-scale energy projects in desert tortoise habitat, including the Stateline Solar and Silver State Solar South projects, indicate that the adverse effects from energy development to the species are increasing and that the cumulative effects of energy development are much greater now than when the ROD was approved.

**WIND FACILITY IMPACTS ON BIRDS & BATS**

68.     Wind energy turbines kill birds through collisions with turbine blades. Birds are also killed or injured by collisions with towers and transmission lines. Avian mortality through collisions with the rotor blades on wind turbines is a chief impact wind facilities have on the environment. Large-scale wind projects have been documented to kill up to 900 birds per year, and up to 350 raptors per year. For example, a two-year survey of the Altamont Pass wind power site in California, which is being aggressively managed to reduce raptor kills, reported over 1,800 bird kills (705 raptors killed, along with 1,095 non-raptors). Transmission lines can decrease the available habitat base and/or effectiveness of habitat. Transmission lines and fences provide perches for raptors and increase the risk of collision mortalities.

69.     Additionally, bats are uniquely vulnerable to the mortality from wind turbines. Large die-offs of bats have been documented at wind energy facilities. Bats are killed both by being struck by moving blades, and by a phenomenon known as "barotrauma." The dramatic change in air pressure that accompanies spinning turbine blades causes the blood vessels in bats'

- 19 -

1    lungs to explode. The factors affecting mortality risks are not fully understood, and are likely the

2    result of complex interactions among many factors.

3        70.    Exacerbating the problem, research indicates that bats are *attracted* to wind

4    turbines. Bats appear to be attracted to insect concentrations near the turbines, or visual or sound

5    cues from the turbines. They also may see the turbines as possible roosting sites. This attraction

6    means wind facilities change the flight patterns of bats.

7        71.    Studies at several of wind power facilities have confirmed avian and bat

8    mortalities from the turbines and associated facilities, and the FEIS even cites studies from other

9    wind facilities in forecasting mortalities caused by the Project. Yet the FEIS fails to examine the

10   full scope of the likely adverse impacts of the Project, including the cumulative impacts of

11   mortality to birds and bats that occupy or migrate through the region caused by the Project along

12   with other existing and proposed industrial-scale wind power facilities and associated

13   infrastructure.

14       72.    On November 4, 2013, Duke Energy Renewables, Inc. agreed to plead guilty to

15   two counts of violation of the Migratory Bird Treaty Act for the killing of 163 migratory birds,

16   including 14 golden eagles, at two industrial-scale wind energy generation sites in Wyoming

17   containing 176 wind turbines. As part of the plea agreement, Duke Energy Renewables, Inc.

18   agreed to obtain take permits for golden eagles for the two sites.

19       73.    On  December 9, 2013, USFWS published a new rule extending the maximum

20   term of programmatic eagle take permits under the BGEPA from five to 30 years.

21   **PROJECT IMPACTS ON SCENIC, CULTURAL, ECONOMIC & HUMAN VALUES**

22       74.    The Project would be built from a half-mile to three miles east of the town of

23   Searchlight, a community of mostly retirees, miners, ranchers, artists and small business owners

24   with a population of about 500 people. Turbines would be constructed as close as 1,345 feet from

25   residential properties, and several residential properties lie within a mile of a turbine. Many

26   studies and real estate estimates disclose that the proximity of an industrial-scale facility of 428-

27   foot tall, spinning turbines, which generate noise comparable to constant highway traffic and

28   cause shadow flicker from the spinning blades, will have a dramatic and negative impact on the

- 20 -

property values and rural character of the Searchlight area. The FEIS fails to disclose and analyze responsible alternative views regarding the effects of the proposed industrial development so close to the town, instead cherry-picking literature (some of it more than a decade old) to arrive at the unsupported conclusion that there will be no negative impacts to property values from the Project. The FEIS similarly fails to disclose the full extent of properties that would be visually and aurally affected by the project.

75.     The Searchlight desert and mountains are characterized by low vegetation, with Joshua trees little more than head-high as the dominant plants. The open vegetation communities allow for unspoiled, unobstructed views from the area to Lake Mohave in the east and to the surrounding, taller mountain ranges. An industrial-scale project of 87, 428-foot tall turbines would degrade the scenic vistas available in and around the Searchlight area, including within the ACEC, the Lake Mead National Recreation Area, and surrounding Wilderness Areas. The FEIS fails to provide accurate information about impacts to the scenic character of the area, notably by considering mainly observation points at some distance from the Project without any that are within the Project area.

76.     The FEIS fails to disclose or analyze effects of the Project on recreation and tourism in the Searchlight area, relying on a statement that there were no studies on the issue as of 2009, failing to search for any more recent or updated information on impacts to recreation and tourism from the presence of an industrial-scale facility in the midst of an important tourist destination. The FEIS similarly recognizes that there will be negative impacts to activities that rely on wilderness or primitive conditions, but does not provide any data or analysis of what those impacts will be. The FEIS selectively cites studies of "600–800" visitors that might be drawn to view the turbines, without evaluating whether the 300,000 visitors who current come to the area for its scenic beauty and to use and enjoy the public lands and resources of the area will avoid the newly-industrialized area and seek recreation and tourism opportunities elsewhere.

77.     Construction and operation of an industrial facility in an area of traditional spiritual value to local Tribes is likely to cause serious harm to the cultural and spiritual values present on and near the Project site. The FEIS acknowledges that there will be potential negative

Exhibit 1 - Page 21 of 32
No. 13-616 - Motion to Supplement & Amend Complaint

impacts during the construction phase, but fails to evaluate whether mitigation will adequately protect cultural values, and also fails to consider potential harm to spiritual values from the operation of an industrial facility in an area of spiritual significance.

78.     Industrial-scale wind energy development can also have serious negative effects on human health. Several studies have shown that low-frequency noise produced by industrial-scale wind turbines, when they increase the background noise by as little as 10 dB, can affect human health and well-being, because wind turbine sound is more noticeable, annoying and disturbing than other community or industrial sounds at the same level of loudness, and wind turbine noise has been linked to increased annoyance, feelings of stress and irritation, sleep disturbance, and decreased quality of life. The FEIS does not evaluate the effect of noise from the Project on human health and well-being.

79.     Dust from the construction and operation of the Project and blowing from barren areas exposed by the Project's development is also likely to have serious human health effects. The Project site is within a couple of miles of the town of Searchlight, within approximately 1,500 feet of some homes, and adjacent to Cottonwood Cove Road, along which more than 300,000 visitors pass each year. The FEIS ignores recent incidents of Valley Fever in nearby communities in Nevada and fails to evaluate the potential effect on human respiratory health from the development of the Project.

80.     The Project is also likely to negatively affect the local economy, which depends on tourism focused on the Lake Mead National Recreation Area. The FEIS fails to examine the negative impact of construction and operation of the Project on this industry, not taking into account the closure of East Cottonwood Cove Road during the construction or the effect of a towering wind energy facility dominating the skyline as visitors make their way to and from Lake Mohave.

81.     The Project also is likely to create an excessive draw on limited water supplies in this arid part of Nevada. The FEIS does not explain where Searchlight Wind will acquire the water rights to the 83 acre feet of water which will be necessary to construct the Project.

//

– 22 –

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
No. 13-616 - Motion to Supplement & Amend Complaint

Exhibit 1 - Page 22 of 32

## APPROVAL OF THE SEARCHLIGHT WIND ENERGY PROJECT

82.    Beginning in late 2008, Catamount Energy Corporation, a subsidiary of Duke Energy, began pursuing development of the Project, proposing to place up to 160 turbines on the public lands surrounding the town of Searchlight, Nevada. The wholly-owned subsidiary of Duke Energy which applied to BLM for the rights-of-way to construct the Project is now called Searchlight Wind Energy, LLC ("Searchlight Wind"). Initial public scoping meetings occurred in early 2009.

83.    Searchlight Wind proposes to construct, operate and maintain a facility using 87 turbines to generate approximately 200 MW of electricity at peak production and submitted a right-of-way application to the BLM for construction and operation of the generation site and associated infrastructure. The Project's generation facilities would be built on ridgelines and plateau areas bounded by Golden Rod Snyder Road on the south, US-95 on the west, Fourth of July Mountains in the east, and extending a few miles north of SR 164/Cottonwood Cove Road, east of the town of Searchlight.

84.    The Western Area Power Administration ("Western") proposes to construct, operate, and maintain a new switching station to interconnect the Project with an existing 230-kV transmission line and submitted a right-of-way application to the BLM for construction and operation of the switching station.

85.    Searchlight Wind does not have a power purchase agreement to sell the power generated by the Project.

86.    In January 2012, BLM issued a Draft Environmental Impact Statement ("DEIS") on the Project. This DEIS was drafted by Searchlight Wind's consultants, with little apparent involvement by BLM or other federal agency scientists. The bias of the consultants preparing the EIS in favor of allowing the Project to be developed is apparent throughout the document, including a narrow and applicant-focused statement of purpose and need; inadequate exploration of potential alternatives, including terms and conditions necessary to preserve wilderness, scenic, wildlife, and other values of the Searchlight area; failure to acknowledge the science demonstrating the widespread adverse impacts of such industrial wind energy development upon

- 23 –

native vegetation, wildlife habitats, and sensitive species, including raptors and desert tortoises; and inadequate discussion of cumulative impacts.

87.    In April 2012, Plaintiffs submitted extensive written comments highlighting the many scientific and legal deficiencies of the DEIS, and submitted additional supplemental information and comments in October 2012. In both sets of comments, Plaintiffs advised BLM of the need to prepare a Supplemental DEIS. In addition to comments from Plaintiffs, BLM received numerous comments from agencies, other organizations, and concerned citizens advising that analysis of environmental impacts in the DEIS was inadequate in light of the effects on scenic, public and private resources in the Searchlight area.

88.    In September 2012, USFWS issued the BiOp for the Project, in which it determined that the Project is likely to adversely affect desert tortoises, but that it is not likely to jeopardize the continued existence of the species and is not likely to adversely modify critical habitat. USFWS issued an ITS in which it concluded that the Project will result in the take of all desert tortoises that occur on the Project work sites and roads and where tortoise exclusion fencing would be installed, and that alteration in feeding, sheltering, and reproductive behavior is likely to occur, together with the reduction or fragmentation of habitat in tortoises' home ranges. Although USFWS acknowledges that it does not know how many tortoises will be encountered in harm's way, the ITS sets the allowable take limits at no more than one subadult or adult desert tortoise and two hatchling or juvenile tortoises killed or injured during the construction phase, with identical limits for the operation phase. The BiOp and ITS do not define what is meant by "injured." The ITS also specifies that there will be 388.5 acres of habitat disturbance, and "[i]f the proposed project-related activities result in impacts to desert tortoise habitat beyond this acreage, the amount or extent of take will be exceeded." The BiOp fails to consider noise impacts to tortoises from construction and operation of the Project both on site and "edge effects" on surrounding tortoise critical habitat. The BiOp also fails to consider the cumulative effects of this project when considered along with other energy development projects currently putting pressure on the desert tortoise throughout the Mojave Desert.

89.    In December 2012, BLM issued a FEIS, which again was prepared by consultants

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

No. 13-616 - Motion to Supplement & Amend Complaint

Exhibit 1 - Page 24 of 32

to the applicant and made only slight modifications to the DEIS.  The FEIS analyzes a no-action alternative (Alternative A) and two action alternatives that are practically indistinguishable—an 87-turbine layout and a 96-turbine layout—which BLM repeatedly acknowledges will have essentially the same environmental effects. The FEIS identifies the 87-turbine layout as its preferred alternative.

90.     The FEIS acknowledges that the Project area and surrounding areas contain desert tortoise habitat, and that infrastructure such as roads, power lines, and renewable energy development degrade and fragment desert tortoise habitat, but fails to acknowledge the effects that noise can have on tortoises in the surrounding ACEC or on the Project site itself. The FEIS does not analyze or disclose the impacts of the Project on the desert tortoise from a landscape or population perspective, or evaluate the cumulative impacts of energy development in California and Nevada on the species.

91.     Bighorn sheep impacts and migratory corridors are not adequately addressed in the wildlife or cumulative impacts sections. The FEIS concludes incorrectly that migratory populations of bighorn sheep will be minimal, despite acknowledging that sheep will alter their normal behavioral patterns in the presence energy development during construction and decommissioning, and without considering at all the effects of the Project's operations on bighorn sheep.

92.     For bats, the wildlife and cumulative impacts analysis failed to discuss at all what the number of expected bat deaths would be, or how any level of bat deaths would affect bat populations in the region, much less the impacts upon any separate bat species. The FEIS and the Bird and Bat Conservation Strategy ("BBCS") for the Project fail to evaluate whether proposed mitigation will be successful in preventing harm to bats.

93.     For raptors, golden eagles, bald eagles, and other birds, the wildlife and cumulative impacts analysis in the FEIS likewise fails to discuss what the likely number of deaths that the Project would cause, nor what the impact of any number of deaths would be on species populations in the region, much less the impacts upon any separate bird species. The FEIS and the Bird and Bat Conservation Strategy ("BBCS") for the Project fail to evaluate

- 25 -

whether proposed mitigation will be successful in preventing harm to birds.

94.     The FEIS fails to evaluate the effects on human health from chronic turbine noise and Valley Fever that could result from the construction and operation of a wind facility in a desert environment near a populated area, and also fails to evaluate the negative economic effects on private property and the tourism-dependent economy of the Searchlight area.

95.     The FEIS fails to evaluate the impacts of the Project on significant cultural resources, including the spiritual significance of degrading the views from Spirit Mountain and the impacts on the Colorado River Indian Tribes if the Project is constructed.

96.     On March 13, 2013, Secretary Salazar signed the ROD approving the grant by BLM of rights-of-way over federal lands for the Project's generation site, transmission line, switching station, and related access roads and facilities. The ROD acknowledged that the Project will cause adverse impacts to resources of the Searchlight area, including impacts to visual, recreational, and wildlife resources. Because it is based on a fundamentally flawed FEIS and BiOp, and on mitigation plans that are not fully developed, evaluated, or disclosed to the public, the ROD is arbitrary, capricious, an abuse of discretion, and contrary to law.

97.     As of the date of this First Supplemental and Amended Complaint, neither Searchlight Wind nor Western has signed the rights-of-way for the Project that were authorized by the ROD in March 2013.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF NEPA

98.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

99.     This First Claim for Relief challenges Defendants' violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations in approving the ROD based on the faulty, incomplete, and inadequate FEIS. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

100.     Defendants violated NEPA and implementing regulations in multiple respects through issuance of the challenged ROD based on the FEIS, including but not limited to:

a.     Failing to take the requisite "hard look" at all of the significant and

- 26 -

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
No. 13-616 - Motion to Supplement & Amend Complaint

Exhibit 1 - Page 26 of 32

potential direct, indirect, and cumulative impacts of the Project, including impacts to desert tortoise, bald and golden eagles, raptors, bats, bighorn sheep, cultural, visual, economic, human health, water, and other resources; and without adequate baseline data;

b.    Adopting the challenged FEIS and ROD without discussing responsible opposing views in the FEIS itself, and failing to disclose high-quality information and accurate scientific analysis regarding the proposed Project;

c.    Adopting too narrow and arbitrary a statement of purpose and need, and failing to consider an adequate range of alternative courses of action, including a distributed solar generation alternative, a private lands/brownfields alternative, a low-desert-tortoise-density site, or imposing adequate terms and conditions or effective mitigation to ensure against adverse impacts on visual, recreational, economic, and ecological resources of the Searchlight area;

d.    Failing to disclose and evaluate the effectiveness of proposed mitigation measures;

e.    Failing to disclose and evaluate impacts to desert tortoises and their critical habitat;

f.    Failing to disclose and evaluate the Project's impacts to human health, private property values, and the economy of the Searchlight area;

g.    Failing to supplement the DEIS and FEIS, including failing to supplement the FEIS based on new information regarding the effects of industrial-scale energy projects, including wind energy projects, on desert tortoises, eagles, other birds, and human health related to projects on federal lands managed by defendant BLM or affecting avian and terrestrial species administered by defendant USFWS.

101.   Based on their violations of NEPA and implementing regulations, Defendants' approval of the challenged FEIS and ROD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and will allow serious ecological degradation as well as harm to the public and Plaintiffs' interests, unless reversed by this Court. Accordingly, the FEIS and ROD must be reversed and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A), and BLM must be

- 27 -

ordered to prepare a Supplemental EIS pursuant to the APA, 5 U.S.C. § 706(1).

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE ENDANGERED SPECIES ACT
## AND ADMINISTRATIVE PROCEDURE ACT

102.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

103.    This Second Claim for Relief challenges the USFWS's violations of the Endangered Species Act, 16 U.S.C. § 1531 *et seq*., and the ESA's implementing regulations in approving the faulty, incomplete, and inadequate BiOp. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

104.    ESA § 7(a)(2) requires USFWS to insure that projects are not likely to jeopardize the continued existence of any endangered or threatened species or to result in the destruction or adverse modification of the designated critical habitat of a listed species. 16 U.S.C. § 1536(a).

105.    The ESA requires USFWS to issue an ITS whenever a proposed federal agency action will not jeopardize a protected species but will result in incidental take of members of the species. 16 U.S.C. § 1536(b)(4).

106.    The BiOp fails to evaluate several significant factors regarding whether the Project is likely to jeopardize the continued existence of desert tortoise or result in the adverse modification of designated critical habitat for tortoises, including but not limited to the following:

a.    Failing to consider the impact from noise during construction and operation on tortoises within and surrounding the Project area and whether noise will result in the adverse modification of designated critical habitat;

b.    Failing to consider whether mitigation measures designed to avoid death and injury to desert tortoises will be effective;

c.    Failing to adequately evaluate the effects and cumulative effects of the action and other energy developments and add those effects to the existing environmental baseline to determine whether the action will jeopardize the existence of desert tortoises or adversely modify critical habitat.

- 28 –

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
No. 13-616 - Motion to Supplement & Amend Complaint

Exhibit 1 - Page 28 of 32

107.    To the extent the BiOp includes a determination as to whether the Project would reduce appreciably the likelihood of both the survival and recovery of desert tortoises, the BiOp fails to include a summary of the information on which the opinion is based or a detailed discussion of the effects of the Project's activities on desert tortoise, and the determination is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA.

108.    The BiOp inappropriately relies on a mitigation strategy that is entirely dependent on the actions of the developer, contractors, and subcontractors which directly harm and are not likely to prevent injury to tortoises, and has vague statements about what, if any, administrative corrective action will be taken upon discovery that the mitigation and monitoring are in fact not working. For these reasons and others, the tortoise mitigation strategies are not "certain to occur" or reasonable likely to be successful and are inadequate to support the BiOp's conclusions.

109.    The conclusions in the BiOp that the actions are not likely to jeopardize the continued existence of the desert tortoise or to destroy or adversely modify designated critical habitat for desert tortoise are not based on the best available science, as required by the ESA, 16 U.S.C. § 1536(a)(2).

110.    The BiOp fails to include appropriate Reasonable and Prudent Measures designed to minimize the impact of the incidental take, in violation of the ESA requirement to specify such measures. 16 U.S.C. § 1536(b)(4)(B)(ii).

111.    The BiOp fails to include appropriate Terms and Conditions, in violation of the ESA requirement to specify such Terms and Conditions. 16 U.S.C. § 1536(b)(4)(B)(iii).

112.    The BiOp fails to evaluate whether the proposed action will provide for the conservation and recovery of the species.

113.    The BiOp fails to include clear, intelligible and scientifically-supported limits of incidental take or triggers for reinitiation of formal consultation.

114.    For each of the above reasons, and others, USFWS's BiOp is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA, and is reviewable under the APA, 5 U.S.C. § 706(2).

//

- 29 –

Exhibit 1 - Page 29 of 32
No. 13-616 - Motion to Supplement & Amend Complaint

**THIRD CLAIM FOR RELIEF**

**VIOLATION OF FLPMA**

115.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

116.    This Third Claim for Relief challenges Defendants' violations of FLPMA, 43 U.S.C. § 1701 *et seq.*, and implementing regulations, in approving the ROD for the Project. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

117.    In approving the ROD, Secretary Salazar acted in a manner that is arbitrary, capricious, an abuse of discretion, and contrary to law in numerous respects, including but not limited to the following:

      a.    Approving a right-of-way for a linear transmission line, a switching station, and other infrastructure through and within the Piute-Eldorado Valley ACEC that is inconsistent with the requirements of the Las Vegas RMP;

      b.    Selectively focusing upon policies of the Interior Department to promote renewable energy on the public lands, while ignoring or downplaying other statutory, regulatory, and policy requirements for the protection of public lands and sensitive wildlife resources under FLPMA, and its implementing regulations and policies; and

      c.    Allowing industrial wind development to occur in the Project area that would cause adverse impacts to visual, recreational, ecological, and other resources in the project area and surrounding ACEC that are to be protected from such impacts under FLPMA.

118.    Based on their violations of the FLPMA and implementing regulations and policies, Defendants' approval of the challenged ROD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and will allow serious ecological degradation as well as harm to the public and Plaintiffs' interests, unless reversed by this Court. Accordingly, the ROD must be reversed and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

//

//

//

– 30 –

1

## FOURTH CLAIM FOR RELIEF

2

## VIOLATION OF BGEPA AND MBTA

3      119.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

4      120.    This Fourth Claim for Relief challenges Defendants' violations of the Bald and

5  Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. §§ 668–668d, and implementing

6  regulations, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703–712, and

7  implementing regulations, in approving the ROD for the Project. Plaintiffs bring this claim

8  pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

9      121.    The BGEPA prohibits the take of bald eagles and golden eagles without

10  permission to do so. The MBTA prohibits the take of migratory birds without permission to do

11  so. Defendants have not obtained a permit pursuant to 50 C.F.R. § 22.26 that would authorize the

12  take of bald or golden eagles nor pursuant to 50 C.F.R. Parts 13 and 21 that would authorize the

13  take of migratory birds. The FEIS recognizes that Project's operation would certainly kill birds,

14  including golden eagles, and bald eagles have been documented in close proximity to the Project

15  site. It is thus a near certainty that the Project will "take" golden eagles and bald eagles, without

16  a permit, and thereby violate the BGEPA and MBTA. And while Searchlight Wind has

17  developed a Bird and Bat Conservation Strategy in consultation with BLM and the USFWS,

18  neither the BBCS nor USFWS's review authorizes take of golden or bald eagles or migratory

19  birds or determines that no take will occur.

20      122.    By approving the Project and its almost certain killing and/or other "taking" of

21  golden eagles and/or bald eagles and/or other migratory birds, without first obtaining a permit

22  authorizing take, Defendants violated the BGEPA and MBTA and failed to proceed in

23  accordance with law as required by the APA.

24

## PRAYER FOR RELIEF

25      Wherefore, Plaintiffs respectfully requests that the Court grant the following relief:

26      A.    Order, adjudge, and declare that the FEIS, BiOp and ROD violate the NEPA,

27  ESA, FLPMA, BGEPA, and/or MBTA, in violation of the APA, 5 U.S.C. § 706;

28      B.    Reverse, set aside, vacate, and remand the FEIS, BiOp and ROD;

- 31 –

1    C.    Enter temporary, preliminary, or permanent injunctive relief as hereinafter prayed

2  for by Plaintiffs, including by enjoining Defendants from allowing construction to commence on

3  the Project through ground-clearing, site preparation, or other such actions until such time as

4  Defendants have fully complied with law and BLM has prepared a new NEPA analysis or

5  supplemented its current analysis in compliance with NEPA;

6    D.    Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees

7  associated with this litigation pursuant to the ESA, the Equal Access to Justice Act, 28 U.S.C. §§

8  2412 et seq., and/or all other applicable authorities; and/or

9    E.    Grant such further relief as Plaintiffs may pray for hereafter or as the Court deems

10  necessary or appropriate to redress the Defendants' legal violations and protect the public lands

11  and resources of the Searchlight area and Piute-Eldorado Valley ACEC from further degradation.

12    DATED this _____ day of December 2013.

13

14    ____/s Donna M. Wittig_____
        DONNA M. WITTIG, ESQ.

15    Nevada Bar No. 11015
        COTTON, DRIGGS, WALCH,

16    HOLLEY, WOLOSON & THOMPSON
        E-mail: dwittig@nevadafirm.com

17    400 South Fourth Street, Third Floor
        Las Vegas, Nevada 89101

18    (702)791-0308

19
        ____/s David H. Becker_____

20    DAVID H. BECKER, ESQ., *Pro Hac Vice*
        Oregon Bar No. 081507

21    E-mail: davebeckerlaw@gmail.com
        Law Office of David H. Becker, LLC

22    917 SW Oak St, Suite 409
        Portland, OR 97205

23    (503) 388-9160

24
        *Of Attorneys for Plaintiffs*

25

26

27

28

FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Exhibit 1 - Page 32 of 32

No. 13-616 - Motion to Supplement & Amend Complaint