UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JUDY BUNDORF, an individual; FRIENDS OF SEARCHLIGHT DESERT AND MOUNTAINS; BASIN AND RANGE WATCH; ELLEN ROSS, an individual; and RONALD VAN FLEET, SR., an individual,<br><br>Plaintiffs,<br>v.<br>S.M.R. JEWELL, Secretary of the Interior; BUREAU OF LAND MANAGEMENT; U.S. FISH & WILDLIFE SERVICE,<br><br>Defendants,<br>v.<br>SEARCHLIGHT WIND ENERGY, LLC,<br><br>Defendant-Intervenor. | Case No. 2:13-cv-00616-MMD-PAL<br><br>ORDER<br><br>(Pls.' Motion for Summary Judgment – dkt. no. 40)<br><br>(Def.-Intervenor's Counter Motion for Summary Judgment – dkt. no. 62)<br><br>(Defs.' Cross Motion for Summary Judgment – dkt. no. 80)<br><br>(Defs.' Motion to Strike – dkt. no. 53)<br><br>(Defs.' Motion to Strike – dkt. no. 78) |

**I.   SUMMARY**

Plaintiffs Judy Bundorf, Friends of Searchlight Desert and Mountains, Basin and Range Watch, Ellen Ross, and Ronald Van Fleet, Sr., allege that Defendants S.M.R. Jewell, Bureau of Land Management ("BLM"), and U.S. Fish and Wildlife Service ("FWS") (collectively, "Federal Defendants") violated several environmental statutes in approving a wind energy project in Southern Nevada. Searchlight Wind Energy, LLC ("Searchlight"), the project's proponent, intervened as a defendant in November 2013.

Before the Court are Plaintiffs' Motion for Summary Judgment ("MSJ") (dkt. no. 40), Federal Defendants' Cross Motion for Summary Judgment ("Cross MSJ") (dkt. no. 80), and Searchlight's Counter Motion for Summary Judgment ("Counter MSJ") (dkt. no. 62).[1] The Court has reviewed the relevant oppositions (dkt. nos. 57, 59, 71) and replies (dkt. nos. 71, 77, 79).

Also before the Court are Federal Defendants' Motions to Strike Plaintiffs' extra-record evidence (dkt. nos. 53, 78). The Court has reviewed Plaintiffs' oppositions (dkt. nos. 73, 82), and Federal Defendants' reply (dkt. no. 75).[2] Searchlight joined Federal Defendants' first Motion to Strike (dkt. no. 68).

The Court held a hearing on the parties' pending motions on November 24, 2014. As a threshold matter, the Court grants, in part, and denies, in part, Federal Defendants' first Motion to Strike (dkt. no. 53) and denies Federal Defendants' second Motion to Strike (dkt. no. 78). The Court remands the administrative record ("AR") for further explanation from the appropriate federal agencies, and orders Federal Defendants to prepare a Supplemental Environmental Impact Statement ("SEIS"). In light of the remand, the Court declines to address the merits of the parties' other arguments in their motions for summary judgment. The Court therefore grants, in part, the MSJ, and denies the Cross MSJ and the Counter MSJ pending amplification of the AR.

**II.   BACKGROUND**

The following facts are undisputed and appear primarily in the AR.[3] On March 13, 2013, former Secretary of the Interior Ken Salazar approved a Record of Decision

---

[1] The Cross MSJ is identical to Federal Defendants' opposition to the MSJ. (*See* dkt. nos. 59, 80.) Similarly, the Counter MSJ is nearly identical to Searchlight's opposition to the MSJ. (*See* dkt. nos. 57, 62.)

[2] Federal Defendants did not file a reply in support of their second Motion to Strike (dkt. no. 78).

[3] Federal Defendants lodged the AR with the Court as dkt. no. 27 in September 2013. The AR was filed with the Court as two CD-ROMs containing consecutively paginated records from the BLM and FWS, respectively. In April 2014, BLM lodged a supplemental AR as dkt. no. 55. BLM's supplemental AR continues the consecutive pagination from BLM's first AR. The Court cites to the consecutive pages for each agency's AR. The Court cites BLM's AR as "BLM-AR," and FWS's AR as "FWS-AR."

("ROD") authorizing — but not finalizing[4] — two right-of-ways ("ROWs") for the Searchlight Wind Energy Project ("Project") on lands administered by the BLM. (BLM-AR 1190, 1205.) The Project includes 87 Wind Turbine Generators ("WTG") capable of providing up to 200 megawatts of electricity and a switching station to connect the wind facility to the electrical gird. (*Id.* at 1191, 1195-96.) The area associated with the Project covers approximately 18,949 acres, with a footprint of 9,331 acres; the ROD states that the Project's facilities will occupy between 152 and 160 acres. (*Id.* at 1192, 1207.) Searchlight applied for the ROW to construct, operate, maintain, and decommission the wind facility while the Western Area Power Administration ("Western"), a federal agency, sought the ROW to carry out the same actions for the switching station. (*Id.* at 3023, 3049.)

Searchlight began the ROW application process through a Plan of Development ("POD") submitted in January 2008 for a wind energy project of up to 156 WTGs. (*Id.* at 839-906.) BLM had initiated a 60-day public scoping period in December 2008. (*Id.* at 3415.) Searchlight issued a revised POD in March 2011 describing a scaled-down project involving 87 WTGs. (*Id.* at 982.) BLM then issued a Draft Environmental Impact Statement ("DEIS") in January 2012, and commenced a 90-day public comment period that ended in April 2012. (*Id.* at 3417.) Plaintiffs submitted comments on the DEIS in April 2012, and offered supplemental information in October 2012. (*Id.* at 534, 4304, 4705.) BLM published a Final Environmental Impact Statement ("FEIS") in December 2012. (*Id.* at 3019.)

The ROD's approval of the 87-WTG Project is based on the FEIS. (*Id.* at 1204.) In addition to the approved 87-WTG Project, the FEIS explores two alternative scenarios: a 96-WTG Alternative and a No-Action Alternative. (*Id.* at 3027.) BLM determined that the

---

[4]During the hearing, Federal Defendants asserted that several steps remain before the Project may proceed, including the following two steps. First, the ROWs must be finalized and issued to Searchlight and Western; Federal Defendants represented that Searchlight's ROW has been finalized, but that, as of November 2014, Western's ROW remained unsigned. Second, after both ROWs are finalized, BLM must determine whether to issue a Notice to Proceed to both Searchlight and Western.

3

96-WTG Alternative reflected the maximum number of turbines available to the Project. (*Id.* at 3070.) BLM described the 87-WTG option as a minimum threshold below which the Project would become economically unfeasible; the 87-WTG Alternative was BLM's Preferred Alternative. (*Id.* at 3069.) For both the 96-WTG Alternative and the 87-WTG Alternative, BLM assumed that the WTGs would reach a maximum height of 427.5 feet, with rotating blades spanning 331 feet in diameter. (*Id.* at 3083-84.)

Located approximately 60 miles southeast of Las Vegas and 1.5 miles east of the Lake Mead National Recreation Area, the Project would stretch around the town of Searchlight along the northeast side of the Piute Valley. (*Id.* at 3129.) This undeveloped area features Mojave Desert ecosystem that spreads across valleys, flats, washes, and hills and mountains locally known as the Searchlight Mountains. (Dkt. no. 40 at 9-10.) The Project is surrounded by a Desert Wildlife Management Area and the Piute-Eldorado Valley Area of Critical Environmental Concern, which BLM manages to protect critical habitat of the desert tortoise. (BLM-AR at 3057, 3188-89.)

Among other species, the FEIS identifies the desert tortoise, 16 bat species, and birds — including the golden eagle — as wildlife that would be affected by the Project. (*See id.* at 3153-64.) Because the desert tortoise is a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, BLM consulted with FWS to ensure that the Project is "not likely to jeopardize the continued existence of" the desert tortoise. 16 U.S.C. § 1536(a)(2). As a result of the consultation, FWS issued a Biological Opinion ("BiOp") in September 2012, concluding that "the action, as proposed, is not likely to jeopardize the continued existence of the species, and is not likely to adversely modify designated critical habitat." (BLM-AR at 170.) The BiOp included an Incidental Take Statement outlining non-discretionary measures for activities that could result in a taking that is "incidental to and not the purpose of the agency action." (*Id.* at 171.) To mitigate the Project's adverse effects on desert tortoises, the FEIS lists the conservation measures laid out in the BiOp. (*Id.* at 3281-85.) For mitigation measures for bat and bird

species, the FEIS references a Bird and Bat Conservation Strategy ("BBCS") prepared by Duke Energy Renewables in October 2012.[5] (*Id.* at 3288-90, 16145.)

Plaintiffs initiated this action in April 2013 pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Plaintiffs allege that in approving the ROD, Federal Defendants violated the National Environmental Policy Act ("NEPA"), the ESA, the Federal Land Policy and Management Act ("FLPMA"), the Bald and Golden Eagle Protection Act ("BGEPA") and the Migratory Bird Treaty Act ("MBTA"). (Dkt. no. 36.) Under § 706(2) of the APA, Plaintiffs allege that the ROD is arbitrary, capricious, an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2)(A); (dkt. no. 36 ¶ 96). Among other remedies, Plaintiffs ask that the Court reverse, set aside, vacate, and remand the FEIS, BiOP, and ROD. (Dkt. no. 36 at 31-32.)  Additionally, under § 706(1) of the APA, Plaintiffs allege that BLM must supplement the FEIS in light of new information on how industrial-scale energy projects, including wind energy projects, affect wildlife and human health. (*Id.* ¶ 101.) Plaintiffs also seek temporary, preliminary, or permanent injunctive relief that would enjoin Defendants from allowing construction to commence. (*Id.* at 32.)

## III.   MOTIONS TO STRIKE

As a threshold matter, Federal Defendants request that the Court strike two declarations that Plaintiffs submitted in support of their MSJ. (Dkt. nos. 53, 78.) The declarations (dkt. nos. 44, 72) are from Scott T. Cashen, a biological resources expert (the "Cashen Declarations"). Federal Defendants contend that the Cashen Declarations and accompanying exhibits amount to extra-record evidence that the Court cannot consider in reviewing the ROD. The Court disagrees.

### A.   Legal Standard

The Court reviews Federal Defendants' approval of the ROWs under the APA because the other statutes under which Plaintiffs challenge the ROD's approval do not

---

[5]As of October 2012, Searchlight was a wholly owned subsidiary of Duke Energy Renewables. (BLM-AR at 3023.) Searchlight is now a wholly owned subsidiary of Apex Wind Energy I LLC. (Dkt. no. 57 at 3.)

create private rights of action. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206-07 (9th Cir. 2004) (noting that NEPA, ESA, and MBTA lack provisions for judicial review). Plaintiffs seek relief under § 706(1) and § 706(2) of the APA — the former allows courts to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), while the latter enables courts to set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 5 U.S.C. § 706(2)(A); *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc), *amended by* 360 F.3d 1374 (2004).

In determining whether to compel agency action under § 706(1), courts may look to evidence outside an agency's administrative record because "there is no final agency action to demarcate the limits of the record." *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).

Under § 706(2), courts "are required to 'engage in substantial inquiry, a thorough, probing, in-depth review.'" *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971) (*overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))) (alteration omitted). As a general rule, however, review under § 706(2) is usually limited to the administrative record that existed at the time of the agency decision and that the agency presents to the court. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

The Ninth Circuit recognizes four exceptions to this general rule regarding § 706(2) review. District courts have discretion to look beyond the administrative record in the following circumstances:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

///

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004) (quoting *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450) (internal quotation marks omitted). These exceptions "are narrowly construed and applied" to foreclose improper de novo review of agency decisions. *Id.* Parties may not use extra-record evidence "as a new rationalization either for sustaining or attacking [an] [a]gency's decision." *Ass'n of Pac. Fisheries v. E.P.A.*, 615 F.2d 794, 811-12 (9th Cir. 1980). Thus, rather than expand the scope of evidentiary review, "these limited exceptions operate to identify and plug holes in the administrative record." *Lands Council*, 395 F.3d at 1030. Parties seeking to expand the scope of review bear a "heavy burden to show that the additional materials sought are necessary to adequately review" an agency's decision. *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

### B. Discussion

The Cashen Declaration submitted in support of Plaintiffs' MSJ ("First Declaration") (dkt. no. 44) identifies factors that were allegedly ignored in the wildlife analyses carried out before the ROD's approval, while the declaration that accompanied Plaintiffs' reply ("Second Declaration") (dkt. no. 72) highlights new information that, Plaintiffs assert, warrants an SEIS. The Court addresses each declaration in turn.

#### 1. First Declaration

Plaintiffs argue that the Court may consider the First Declaration under either the first or third exceptions. *See Lands Council*, 395 F.3d at 1030. For the first exception, Plaintiffs assert that the First Declaration identifies factors that Federal Defendants failed to consider or explain in their wildlife analyses, such as the protocols that governed baseline surveys of wildlife in and around the Project area, certain conclusions about adverse effects on wildlife habitat, and the efficacy of various mitigation measures. (Dkt. no. 73 at 6-9; *see, e.g.*, dkt. no. 44 ¶¶ 6-7, 11-17, 24, 27, 35-40, 42-46, 50, 56-60, 62-67.) For the third exception, Plaintiffs contend that the declarations help explain at least two technical matters to the Court: first, calculations underlying a remuneration fee that appears in the FEIS, and second, protocols for avian surveys. (Dkt. no. 73 at 10-11; *see*

dkt. no. 44 at ¶¶ 28-31, 36-46.) The Court finds that assertions in the First Declaration fall within the first exception, but not the third.

### a. First Exception

Courts may admit evidence under the first exception "only to help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious." *San Luis & Delta-Mendota Water Auth. v. Locke* (*San Luis v. Locke*), No. 12-15144, 2014 WL 7240003, at *9 (9th Cir. Dec. 22, 2014). In two recent decisions, the Ninth Circuit has rejected extra-record evidence that district courts admitted under this exception, but that was used to "judge the wisdom of the agency's scientific analysis." *Id.*; *see also San Luis & Delta-Mendota Water Auth. v. Jewell* (*San Luis v. Jewell*), 747 F.3d 581, 602-04 (9th Cir. 2014). In *San Luis v. Locke*, the Ninth Circuit rejected the district court's references to expert declarations that critiqued the agency's statistical analyses, suggested alternative statistical inquiries, and offered competing interpretations of the agency's data. *See San Luis v. Locke*, 2014 WL 7240003, at *10 (citing *In re Consolidated Salmonid Cases*, 791 F. Supp. 2d 802 (E.D. Cal. 2011)). Similarly, in *San Luis v. Jewell*, the Ninth Circuit admonished the district court for creating a battle of the experts by admitting approximately 40 expert declarations, relying on those extra-record materials "as the basis for rejecting [a Biological Opinion]," and effectively initiating "a post-hoc notice-and-comment proceeding involving the parties' experts, and then judg[ing] the [agency's decision] against the comments received." *San Luis v. Jewell*, 747 F.3d at 603-04.

Here, Plaintiffs ask the Court to consider two declarations from the same expert primarily — but not exclusively — for the purpose of identifying factors missing from Federal Defendants' wildlife analyses. Federal Defendants argue that "all of the 'factors' identified by Plaintiffs were considered, thoroughly, by the agencies." (Dkt. no. 75 at 5.) The Court agrees that some of the factors raised in the First Declaration were considered and explained in the FEIS or its underlying documents. Those factors include, among others, the Project's cumulative impacts on desert tortoise habitat and

populations (*see* dkt. no. 44 ¶ 20; BLM-AR at 169-70; FWS-AR at 2160) and the presence of bald eagles near the Project area (*see* dkt. no. 44 ¶ 36; BLM-AR 4125). Moreover, with regard to survey methodologies, the Court notes that "NEPA's requisite hard look does not require adherence to a particular analytic protocol." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2008) (citation and internal quotation marks omitted). The Court will therefore strike Mr. Cashen's critiques of the agencies' selected methods.[6] (*See, e.g.*, dkt. no. 44 ¶¶ 37, 42.) The Court further finds that some assertions constitute improper critiques of Federal Defendants' scientific analyses, including how the agencies classified nests observed during golden eagle surveys. (*See, e.g.*, *id.* ¶¶ 44-45.) The Court, however, declines to strike the First Declaration in its entirety, and finds that the following portions of the First Declaration point out factors that are missing from Federal Defendants' wildlife analyses, and that the reasons for their absence are not clear from the AR.

First, Mr. Cashen identifies several gaps in the desert tortoise analyses, including unexplained inconsistencies in BLM's and FWS's use of survey data to calculate desert tortoise density.[7] (*See id.* ¶¶ 6-7); *see also Lands Council*, 395 F.3d at 1031-32 (NEPA requires "up-front disclosures of relevant shortcomings in the data or models," and an FEIS must "contain high-quality and accurate scientific analysis"). The declaration further notes that conclusions regarding the fragmentation of desert tortoise habitat — including adverse effects caused by noise and the population effects of the potential loss of "highly suitable" habitat (BLM-AR at 165) — lack clear explanations. (Dkt. no. 44 ¶¶ 8, 11-17; *see* BLM-AR at 161, 163, 165-66, 168-69, 173, 3279-85; FWS-AR at 207-08.) Moreover, as the declaration suggests (dkt. no. 44 ¶¶ 27-28), the mitigation measures outlined in

---

[6] The Court will not, however, strike those portions of the Cashen Declarations that identify unexplained discrepancies between data in the FEIS (or its references) and prescribed methodologies. (*See, e.g.*, dkt. no. 44 ¶¶ 38, 41, 43.)

[7] Federal Defendants do not dispute that these inconsistencies exist. (*See* dkt. no. 80 at 23-24.) Moreover, during oral argument, counsel for Federal Defendants acknowledged that Federal Defendants are uncertain as to which agency's density calculation is correct.

1  the BiOp and in the FEIS warrant further explanation — for instance, it is not clear
2  whether Federal Defendants considered the long-term effects of blasting on desert
3  tortoises. (*See* BLM-AR at 151, 3120.) Finally, neither the BiOp nor the FEIS explains
4  the per-acre remuneration rate used to calculate the remuneration fee. (Dkt. no. 44 ¶¶
5  28-31; *see* BLM-AR at 164-69, 178, 187, 3279-85.)

6  Next, the First Declaration indicates that there are gaps underlying BLM's
7  conclusion that risks to bald eagles are nonexistent, even in light of baseline surveys
8  conducted in December 2011 and January 2012 that yielded no observations of bald
9  eagles. (*See* dkt. no. 44 ¶¶ 35, 40.) This conclusion warrants further explanation.
10 Indeed, the report from the winter 2012 baseline survey, which the BBCS references,
11 does not appear to be in BLM's AR — only observation worksheets reflecting raw data
12 collected during the winter survey are available. (*See* BLM-AR at 418-22, 4125.)

13 Most of the First Declaration's discussion of golden eagles focuses on survey
14 methodology. (*See* dkt. no. 44 ¶¶ 41-46.) As noted above (*see supra* note 6), the Court
15 will consider the First Declaration's discussion of Federal Defendants' adherence to
16 FWS's survey protocols for golden eagles to the extent they were available when the
17 golden eagle surveys occurred. (Dkt. no. 44 ¶ 41, 43; *but see* BLM-AR at 3737
18 (suggesting that no Nevada-specific survey protocols were available when the baseline
19 surveys were developed).) The Court will also review the declaration's discussion of lost
20 recruitment as a risk to golden eagles, which does not appear in the FEIS's or BBCS's
21 discussion of annual mortality estimates. (Dkt. no. 44 ¶ 49; *see* BLM-AR at 3289-90,
22 4132-35.) The Court will also consider the First Declaration's statement that an analysis
23 of the cumulative effects on golden eagles is absent from the FEIS. (Dkt. no. 44 ¶ 51;
24 *see* BLM-AR at 3411.) The First Declaration additionally notes that FWS suggested that
25 the Project proponents seek a programmatic take permit for golden eagles and develop
26 an Eagle Conservation Plan. (Dkt. no. 44 ¶ 50.) The Court will consider this portion of
27 the First Declaration because it is not clear how FWS's suggestion factored into the
28 Project's approval. (*See* BLM-AR 134, 430-31.)

Finally, with respect to bats, the Court finds that the first exception applies to the First Declaration's identification of mitigation measures that the FEIS does not consider or explain, including mitigation for the Project's anticipated adverse effects to roosting habitats (*see* dkt. no. 44 ¶¶ 57, 59; BLM-AR at 4140-41, 4146-53, 4198), and how a plan to curtail turbine operations to curb bat and bird fatalities will operate. (*See* dkt. no. 44 ¶¶ 62, 65-67; BLM-AR at 4150-51.)

### b. Third Exception

Plaintiffs additionally contend that the First Declaration helps explain technical terms and complex subject matter by discussing the avian survey methodologies and remuneration fees for desert tortoise mitigation. (Dkt. no. 73 at 10-11.) Under the third exception, the Court may admit extra-record evidence as background information on complex issues. *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982). But neither the survey methodologies nor the remuneration fee calculation are complex enough to require looking beyond the AR. Rather, as discussed above, the First Declaration identifies factors missing from the AR's treatment of both avian survey methodologies and desert tortoise remuneration fees.

Because further explanation of these factors is necessary for the Court's review of Federal Defendants' decision to approve the Project, the Court denies, in part, Federal Defendants' Motion to Strike (dkt. no. 53). Moreover, in light of these missing factors, the Court will remand the AR to Federal Defendants for amplification rather than review the ROD on the merits with the help of the First Declaration.

### 2. Second Declaration

The Second Declaration offers new information about the abundance and range of golden eagles in the Project area. (*See* dkt. no. 72.) Whereas Plaintiffs offered the First Declaration to support their contention that the ROD's approval was arbitrary and capricious under APA § 706(2), Plaintiffs rely on the Second Declaration to argue, under APA § 706(1), that Federal Defendants must prepare an SEIS in light of new information that affects ongoing federal actions. Defendants urge the Court to strike the Second

1  Declaration, arguing that Plaintiffs cannot compel BLM to prepare an SEIS because no
2  major federal action remains to occur. (Dkt. no. 77 at 22.)[8] Given that courts may look
3  outside the administrative record in reviewing actions brought under APA § 706(1), the
4  Court disagrees. *See Friends of Clearwater*, 222 F.3d at 560.

5  NEPA's implementing regulations require a federal agency to supplement its FEIS
6  if "[t]here are significant new circumstances or information relevant to environmental
7  concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii).
8  Because "[a]n action to compel an agency to prepare an SEIS . . . [is] an action arising
9  under 5 U.S.C. § 706(1)," reviewing courts are not limited to the administrative record.
10 *Friends of Clearwater*, 222 F.3d at 560. The Court thus declines to strike the Second
11 Declaration because it may review materials outside the AR in determining whether to
12 compel the preparation of an SEIS. Here, the Court compels the preparation of an SEIS.
13 (*See* discussion *infra* Part IV.B.1.)

14 **IV.    MOTIONS FOR SUMMARY JUDGMENT**

15     **A.    Legal Standard**

16 Summary judgment is appropriate when "the movant shows that there is no
17 genuine dispute as to any material fact and the movant is entitled to judgment as a
18 matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23
19 (1986). Where, as here, review of an agency action is sought not based upon a "specific
20 authorization in the substantive statute, but only under the general review provisions of
21 the APA," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990), the court does not
22 determine whether there are disputed issues of material fact as it would in a typical
23 summary judgment proceeding. Rather, the court's review is based on the administrative
24 record. *Nw. Motorcycle Ass'n v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

25 A court may reverse an agency decision only if it is "arbitrary, capricious, an
26 abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An

---

[8] Because Federal Defendants failed to file a reply in support of their motion, the Court relies on arguments presented in the Cross MSJ briefing, and at the hearing.

agency's decision may be reversed as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (U.S. 1983).

In reviewing an agency's decision under this standard, "the reviewing court may not substitute its judgment for that of the agency." *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003). Although this review is narrow, "a reviewing court must conduct a searching and careful inquiry into the facts." *Nw. Motorcycle Ass'n*, 18 F.3d at 1471. "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1159 (1980). Thus, "[w]hen there is a need to supplement the record to explain agency action, the preferred procedure is to remand to the agency for its amplification." *Pub. Power Council*, 674 F.2d at 794.

**B.     Discussion**

Plaintiffs argue that Federal Defendants' ROD is arbitrary and capricious because it violates the MBTA, the BGEPA, and FLPMA, and because it was premised on a faulty FEIS that violates NEPA. Plaintiffs further contend that Federal Defendants must supplement the FEIS in light of recent information addressing the impact of wind energy projects on wildlife and human health. Additionally, Plaintiffs argue that FWS's BiOp fails to comply with the ESA and is therefore arbitrary and capricious. Defendants insist that the ROD and its underlying documents complied with these statutes.

**1.     NEPA**

NEPA is a procedural statute that requires federal agencies to "assess the environmental consequences of their actions before those actions are undertaken."

13

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA also provides for public participation in assessing a proposed action's environmental consequences, enabling the public to "play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Although NEPA lacks a substantive mandate, its "action-forcing" procedural requirements help carry out a "national commitment to protecting and promoting environmental quality." *Id.* at 348. As part of these action-forcing requirements, NEPA mandates that agencies considering "major Federal actions significantly affecting the quality of the human environment" must, to the fullest extent possible, prepare an environmental impact statement ("EIS"). 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11.

The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. After an agency has prepared a draft or final EIS, the agency must issue an SEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). This regulation applies (1) "[i]f there remains major Federal action to occur," and (2) "if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 374 (1989) (alternations and internal quotation marks omitted). An agency cannot ignore "new information that may alter the results of its original environmental analysis." *Friends of Clearwater*, 222 F.3d at 557.

Plaintiffs argue that Federal Defendants violated NEPA by relying on a faulty and incomplete FEIS in approving the ROD. Plaintiffs allege that three flaws undermine the FEIS: (1) the FEIS failed to take a hard look at the Project's environmental consequences, including the Project's impacts on wildlife, human health, and property;

1  (2) the FEIS's Statement of Purpose and Need was impermissibly narrow, which unduly
2  limited the range of alternatives considered; and (3) the FEIS must account for recent
3  information on the effects of industrial-scale wind energy projects on wildlife and human
4  health. (Dkt. no. 40 at 23-38.) Defendants argue that Plaintiffs improperly attack FEIS's
5  methodologies and scientific conclusions about wildlife, that the FEIS's Statement of
6  Purpose and Need and alternatives analysis comply with NEPA and its implementing
7  regulations, and that Federal Defendants need not prepare an SEIS because Federal
8  Defendants will take no further major federal action. (Dkt. no. 80 at 32-52.)

Based on the above analysis, the Court finds that further explanation from Federal Defendants is necessary before the Court can review the merits of Plaintiffs' claim that the FEIS violates NEPA. *See Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) ("If the court determines that the agency did not consider all the relevant factors then it should remand the matter to the agency."). As noted, the Court declines to strike certain portions of the First Declaration because they exhibit relevant factors that are missing from Federal Defendants' wildlife analyses. In amplifying the AR upon remand, FWS and BLM should, at a minimum, address gaps in the FEIS's and BiOP's analyses of the density of desert tortoises, the adverse effects on desert tortoise habitat due to noise, and the remuneration fees and blasting mitigation measures. FWS and BLM should further explain the status of FWS's recommendations regarding eagle take permitting and an Eagle Conservation Plan. BLM should also address its conclusions about risks to bald eagles, protocols for golden eagle surveys, and risks and mitigation measures for bat species.

The Court also finds that an SEIS is warranted because the Second Declaration offers significant new information about the Project's environmental effects, and because major federal actions remain to occur. *See Marsh*, 490 U.S. at 374. Specifically, the

///
///
///

Second Declaration suggests that, based on nest surveys conducted in 2011,[9] there is a much larger presence of golden eagles within 10 miles of the Project area than the FEIS reports. (*See* dkt. no. 72 ¶¶ 5-8 (noting that recent data show 19 probable or confirmed golden eagle nests within 5 miles of the Project site, while the FEIS discloses 3 nests within 10 miles); BLM-AR at 4123.) The declaration additionally states that data are now available about the size of golden eagles' home ranges and their foraging distances in the Mojave Desert. (Dkt. no. 72 ¶ 11.) In assessing the Project's risks to golden eagles, the FEIS relies on data from Idaho habitats, noting that such data were not available for Mojave Desert habitats. (*See* BLM-AR 4130.) In December 2012, however, researchers published a study addressing golden eagle home ranges and foraging distances in the Mojave Desert. (Dkt. no. 72 ¶ 11.) The study shows larger home range sizes and foraging distances than those reported in the FEIS. (*Id.*) Taken together, this new information is sufficient to show significant environmental effects that Federal Defendants should consider in an SEIS.

Furthermore, the Court finds that BLM retains enough discretion in finalizing Western's currently unissued ROW[10] to constitute an ongoing major federal action. *See Marsh*, 490 U.S. at 374 (an SEIS may be compelled if "there remains major federal action to occur"). Although Federal Defendants concede that BLM retains some discretion in issuing the ROW, they argue that the ROD finalized the major federal action to which the NEPA analysis applied. Specifically, the FEIS assisted BLM in deciding whether to (1) "[a]pprove the Proposed Action or alternative and grant the ROWs to [Searchlight] and Western;" (2) "[a]pprove the Proposed Action or alternative and grant the ROWs with mitigation measures;" or (3) "[d]eny the ROW applications." (BLM-AR at 3054.) This decision is governed, in part, by 43 C.F.R. § 2805.10(a)(1), which states that

---

[9]Plaintiffs assert that the 2011 surveys were part of a program funded by BLM's Nevada office. (Dkt. no. 72 ¶ 2.) During the hearing, Federal Defendants represented that they were unaware whether BLM considered these surveys in its NEPA analysis.

[10]As of the November 24, 2014, hearing, BLM had not issued Western's ROW.

a ROW applicant will receive an unsigned ROW grant after BLM approves its application. The next subsection, however, notes that if an applicant "agrees with the terms and conditions in the unsigned grant," BLM "will sign the grant and return it to [an applicant] with a final decision issuing the grant *if the regulations in this part . . . remain satisfied.*" 43 C.F.R. § 2805.10(b) (emphasis added). These regulations confirm that BLM retains some discretion in issuing a final ROW grant.

Federal Defendants cite several distinguishable cases to argue that the discretion BLM retains is insufficient to warrant an SEIS. First, in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 71-73 (2004), the Supreme Court held that no major federal action remained after the approval of a land use plan, which the Court characterized as "generally a statement of priorities [that] guides and constrains actions, but does not (at least in the usual case) prescribe them." Similarly, in *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004), the Ninth Circuit concluded that because the federal agency had already approved and issued a helicopter take permit, no major federal action remained to occur. Here, conversely, the ROW has not yet been issued to Western. Nor is BLM's decision merely a guidance document or a statement of priorities, as was the case in *SUWA*. Rather, BLM may prescribe modifications in deciding whether to issue an ROW grant to Western. *See, e.g.*, 43 C.F.R. § 2804.26 (listing reasons for which BLM may refuse to issue an ROW). Accordingly, the Court finds that a major federal action remains to occur. Federal Defendants must prepare an SEIS that addresses the new information about golden eagles in and around the Project area.

### 2. ESA, FLPMA, BGEPA, MBTA

Because the Court will remand the ROD, FEIS, and BiOp to Federal Defendants, the Court declines to address the merits of the parties' remaining arguments under the ESA, FLPMA, the BGEPA and the MBTA.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and

determines that they do not warrant discussion as they do not affect the outcome of the Motions.

It is ordered that Federal Defendants' Motion to Strike (dkt. no. 53) is granted in part and denied in part. It is further ordered that Federal Defendants' second Motion to Strike (dkt. no. 78) is denied. The Court remands the Record of Decision, the Final Environmental Impact Statement, and the Biological Opinion to the appropriate federal agencies for amplification of the administrative record to explain the missing factors that the Court has identified.

It is further ordered that Plaintiffs' Motion for Summary Judgment (dkt. no. 40) is granted in part. Federal Defendants are to prepare a Supplemental Environmental Statement addressing the Project's effects on golden eagles in light of the new information discussed above. Federal Defendants' Cross Motion for Summary Judgment (dkt. no. 80) and Searchlight's Counter Motion for Summary Judgment (dkt. no. 62) are denied pending amplification of the administrative record.

DATED THIS 3rd day of February 2015.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE